IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 12-03033-01-CR-S-DW |
| | ) | |
| STEVEN BRAYFIELD, SR., | ) | |
| | ) | |
| Defendant. | ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on defendant's Motion to Suppress (doc #31). For the reasons set forth below, it is recommended that the motion be denied.

I. BACKGROUND

On April 4, 2012, the Grand Jury returned a four-count indictment against defendant Steven Brayfield, Sr. Count One of the indictment charges that on November 21, 2011, defendant knowingly possessed with the intent to distribute fifty grams or more of methamphetamine. Count Two charges that on November 21, 2011, defendant knowingly distributed five grams or more of methamphetamine. Count Three charges that on November 21, 2011, defendant knowingly used or maintained a building located at 1919 N. Benton, Springfield, Missouri, for the purpose of distributing methamphetamine. Count Four charges that on July 12, 2011, defendant knowingly possessed with the intent to distribute five grams or more of methamphetamine.

An evidentiary hearing on the motion to suppress was held on April 5, 2013. Defendant Brayfield was represented by retained counsel Donald R. Cooley. The government was represented by Assistant United States Attorney Ami Harshad Miller. The government called

Officer Travis Wilson of the Springfield, Missouri Police Department as a witness. The defense called defendant Brayfield to testify.

## II. FINDINGS OF FACT

On the basis of the evidence presented at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. On July 12, 2011, Officer Travis Wilson was on patrol in the area of 1919 North Benton Avenue looking for Steven Brayfield, Jr., who had a parole absconder warrant. (Tr. at 4-5, 46) Officer Wilson had two civilians riding with him that night. (Tr. at 32) The two civilians were a film crew for the television show COPS. (Tr. at 32) When he arrived in the area, Officer Wilson observed a dark-colored truck drive south on Benton that looked as though it had just left the residence at 1919 North Benton Avenue. (Tr. at 5, 16) The truck went west on Chase and accelerated beyond the posted speed limit. (Tr. at 5) Officer Wilson thought that Steven Brayfield, Jr., might have been in the truck and tried to catch up with it, but it successfully eluded the officer. (Tr. at 5)

2. Officer Wilson went back and conducted surveillance of 1919 North Benton Avenue from an alley just south of the residence. (Tr. at 5-6) A short time later, just before midnight, Officer Wilson observed a pickup truck pull into the driveway of 1919 North Benton Avenue. (Tr. at 5-6, 46) Officer Wilson was not sure if this was the truck he had seen leaving the residence earlier. (Tr. at 16) Officer Wilson pulled into the driveway behind the truck. (Tr. at 6) Officer Wilson testified that he did not initiate a traffic stop on the truck and he did not activate the emergency sirens or lights on the patrol vehicle, rather he made consensual contact with the occupants of the truck. (Tr. at 6) Officer Wilson identified himself, walked up to the two individuals and asked how they were doing. (Tr. at 7) The two civilians exited the police vehicle with Officer Wilson and were filming the encounter. (Tr. at 36)

3. Officer Wilson recognized the driver of the pickup truck as Steven Brayfield, the father of Steven Brayfield, Jr. (Tr. at 6) Officer Wilson testified that he recognized Steven Brayfield because he had previously had contact with him during a traffic stop. (Tr. at 6-7) Officer Wilson did not recognize the passenger of the pickup truck until he told Officer Wilson his name, Larry Shelton. (Tr. at 7, 10) Officer Wilson testified that once Shelton told him his name, he realized that he had spoken with him in the past as well. (Tr. at 7) Officer Wilson knew Steven Brayfield and Larry Shelton to have been drug users in the past. (Tr. at 7) During the previous traffic stop, Steven Brayfield had told Officer Wilson that he had done meth in the past. (Tr. at 8)

4. Defendant Brayfield testified that as soon as he exited his vehicle, the police officer approached him and there were people with bright lights and a camera. (Tr. at 55) According to defendant Brayfield, the officer immediately identified himself as a police officer. (Tr. at 57) Defendant Brayfield testified that the area was lit up like daylight. (Tr. at 56) Defendant Brayfield testified that he was disturbed by this and did not know what was going on. (Tr. at 56)

5. Officer Wilson testified that Steven Brayfield and Larry Shelton reacted in a casual, friendly manner to him. (Tr. at 8) Officer Wilson explained that he was looking for Steven Brayfield, Jr. because he had a warrant and asked Steven Brayfield and Shelton if they knew where he was. (Tr. at 9) The two told Officer Wilson that they did not know where Steven Brayfield, Jr. was. (Tr. at 9) Defendant Brayfield testified that, at this point, two people came out of the house (his youngest son and his son's friend) and Officer Wilson told them to get back in the house. (Tr. at 62)

6. Based on the information Officer Wilson knew about Steven Brayfield and Larry Shelton, the fact that the residence at 1919 North Benton Avenue was a known drug residence[1] and the possibility that Brayfield and Shelton had been driving the truck that had eluded Officer Wilson earlier that evening, Officer Wilson continued his conversation with Brayfield and Shelton and asked if he could pat them down for weapons. (Tr. at 9, 29) Larry Shelton gave his consent and Officer Wilson patted him down. (Tr. at 10) As he patted Shelton's pockets, Officer Wilson felt something that he believed to be a glass bulb. (Tr. at 10) Given Officer Wilson's training and experience, he believed the object to be a smoking pipe. (Tr. at 10) Officer Wilson asked Shelton what the object was and Shelton replied that it was a smoking pipe that he used to smoke incense. (Tr. at 10) Officer Wilson asked Shelton if he could remove the item from his pocket. (Tr. at 10) Shelton told Officer Wilson that he could. (Tr. at 10) Officer Wilson pulled out the smoking pipe, looked at it briefly and concluded the pat-down of Shelton. (Tr. at 10) Officer Wilson testified that during his pat-down and search of Larry Shelton, Shelton never withdrew his consent to the pat-down nor did he ask Officer Wilson to stop. (Tr. at 10)

7. While he was patting down Larry Shelton, Officer Wilson observed Steven Brayfield, who was standing a few feet to Wilson's left at the bumper of the truck,[2]

---

[1] Officer Wilson testified that other officers from his squad "had made car stops of vehicles leaving that address and made drug arrests there before." (Tr. at 9)

[2] Defendant Brayfield testified that he could not see what Officer Wilson and Larry Shelton were doing because he was told to stay where he was while Wilson and Shelton were on the other side of the truck. (Tr. at 58-59) Officer Wilson denied that he told Steven Brayfield anything about where he should be while he patted down Shelton. (Tr. at 20) According to Officer Wilson, "[Brayfield] was in plain view of me which was good enough." (Tr. at 21)

put his hand in his pants pocket.[3] (Tr. at 11) Officer Wilson asked Steven Brayfield to remove his hand from his pocket for officer safety purposes. (Tr. at 11) Officer Wilson testified that anytime he deals with subjects who have a known criminal history,[4] he has to be concerned that they might have a knife, a gun or something else that could be used to harm an officer. (Tr. at 11)

8. After he had finished with the pat-down of Larry Shelton, Officer Wilson asked Steven Brayfield if he could pat him down for weapons.[5] (Tr. at 11) Officer Wilson testified that Steven Brayfield gave his consent. (Tr. at 11) Officer Wilson began with a pat-down of Steven Brayfield's outer clothing in his waist and leg area. (Tr. at 11) When he did not feel any weapons, Officer Wilson asked Steven Brayfield if he could search his pockets.[6] (Tr. at 12) Officer Wilson did not tell Steven Brayfield that he could refuse consent or that he was free to leave, even though Wilson testified that Brayfield was free to leave at that time. (Tr. at 40-41) Officer Wilson estimated that five to seven minutes had elapsed since the time Wilson exited his police vehicle to the time he asked Steven Brayfield for consent to search his pockets. (Tr. at 45) Officer Wilson testified that Steven Brayfield gave him permission to search his pockets.[7] (Tr. at 12) In Steven Brayfield's front right pocket, Officer Wilson found a clear plastic bag that contained a crystalline substance that Officer Wilson believed to be crystal methamphetamine. (Tr. at 12) At this point, Officer Wilson testified that Steven Brayfield was no longer free to leave. (Tr. at 41) Officer Wilson testified that Steven Brayfield never withdrew his consent to the pat-down, he never asked Officer Wilson to stop, he did not make any statements that would indicate it was no longer a consensual encounter nor did he make any attempt to physically leave. (Tr. at 11-12)

---

[3] Defendant Brayfield testified that he was handcuffed by Officer Wilson before Wilson went to the other side of the truck with Larry Shelton. (Tr. at 59) When asked by his counsel if he knew for sure whether he was handcuffed, defendant Brayfield replied, "Yes, sir. Pretty much." (Tr. at 59) Officer Wilson denied that Steven Brayfield was handcuffed. (Tr. at 42) Defendant Brayfield also testified that Larry Shelton was handcuffed, but later admitted that he "just presumed" Shelton was handcuffed because, as he had testified earlier, he could not see what was going on with Shelton. (Tr. at 59-60, 63)

[4] Officer Wilson testified that he knew that Steven Brayfield had a prior felony conviction. (Tr. at 48)

[5] Defendant Brayfield testified that Officer Wilson did not ask Brayfield if he could pat him down. (Tr. at 60)

[6] Officer Wilson testified that he had felt a bulge in Steven Brayfield's pocket, but testified that it could have been anything. (Tr. at 37-38) Based on Steven Brayfield's earlier furtive movement of putting his hand in his pocket, Officer Wilson thought it possible that Brayfield had contraband in his pocket. (Tr. at 39)

[7] Defendant Brayfield testified that he did not consent to Officer Wilson searching his pockets. (Tr. at 60-61)

4

9. Officer Wilson read Steven Brayfield his <u>Miranda</u> warning. (Tr. at 12) Officer Wilson testified that Steven Brayfield agreed to speak with him. (Tr. at 13) Officer Wilson then asked Steven Brayfield if it was meth and Brayfield said yes.[8] (Tr. at 12) Officer Wilson then asked if it was crystal meth and Brayfield said yes. (Tr. at 12) Officer Wilson testified that Steven Brayfield never withdrew his consent to speak with Wilson, never requested an attorney nor attempted to leave the area. (Tr. at 13)

10. Officer Wilson conducted a field test on the substance he had taken from Steven Brayfield's pocket and confirmed that it was contraband. (Tr. at 43) Officer Wilson did not arrest Steven Brayfield. (Tr. at 43) Officer Wilson testified that if the follow-up investigators wanted to put a warrant out for Steven Brayfield based on the methamphetamine, they could do that. (Tr. at 43) Officer Wilson testified that this practice is common due to the over-population at the Greene County Jail. (Tr. at 44) Officer Wilson told Steven Brayfield that he was free to go and arrested Larry Shelton on an outstanding drug warrant.[9] (Tr. at 13, 22, 40)

11. Officer Wilson testified that he did not threaten or physically intimidate Steven Brayfield. (Tr. at 46) Brayfield was not restrained. (Tr. at 48) The only command Officer Wilson gave Brayfield was for Brayfield to remove his hand from his pocket. (Tr. at 46-47) Officer Wilson did not make any promises or misrepresentations to Brayfield when asking for consent for the pat-down or to search his pockets. (Tr. at 47) Officer Wilson estimated that Brayfield was in his early 50s.[10] (Tr. at 47) Defendant Brayfield testified that he was not under the influence of alcohol or drugs. (Tr. at 65-66) Brayfield had prior contact with law enforcement as well as a criminal history. (Tr. at 47, 64-65) Officer Wilson testified that Brayfield was familiar with the judicial system and that he had a prior felony conviction. (Tr. at 48) Defendant Brayfield admitted that he had "been through the system before." (Tr. at 65)

12. Officer Wilson testified that at all times during his encounter with Steven Brayfield, Wilson believed that the encounter was consensual and that the consents given by Brayfield were voluntary. (Tr. at 48)

---

[8] Defendant Brayfield testified that he did not know what the substance was that Officer Wilson found in his pocket. (Tr. at 64) Defendant Brayfield testified that he had been told that the substance was incense. (Tr. at 64)

[9] At some time after Officer Wilson initiated the contact, a backup officer arrived. (Tr. at 24) Officer Wilson testified that his backup officer took Steven Brayfield's and Larry Shelton's IDs and ran them for warrants while Wilson was talking to them. (Tr. at 23) Officer Wilson testified that it is standard procedure to check any subject that he deals with in a criminal manner for warrants. (Tr. at 25) Officer Wilson does not know whether he knew that Shelton came back with a warrant before or after he asked for consent to pat him down. (Tr. at 23)

[10] Steven Brayfield was born on May 16, 1957. (Indictment (doc #1) at 1)

5

13. Defendant Brayfield testified that he brought Larry Shelton to the house that night (at midnight) so that Shelton could borrow a scooter from Brayfield. (Tr. at 66) According to defendant Brayfield, Shelton was going to come back the next day on the scooter to work on Brayfield's car. (Tr. at 66)

14. Any tapes (video or audio) of this incident taken by the film crew were erased by the production company when it was determined that the incident was a non-story which would not be aired on the television show COPS. (Letter, dated April 23, 2013, from Ronald J. Tropp, attorney for Langley Productions, to Assistant United States Attorney Ami Harshad Miller (doc #49-1))

## III. DISCUSSION

Defendant Brayfield seeks to suppress as evidence all items seized pursuant to a warrantless search of defendant's person by Officer Travis Wilson. (Motion to Suppress (doc #31) at 1) Specifically, defendant argues the pat down and seizure of items pursuant to a search of defendant's person were violative of defendant's Fourth Amendment rights.[11] (Id. at 2) With respect to the unavailability of any tape recording of the incident in question, defendant argues that suppression is warranted based on the failure of law enforcement to secure a copy of evidence associated with the events of this case. (Defendant's Reply Suggestions to Government's Responsive Pleading (doc #50) at 2)

In United States v. Rayos-Parra, 312 F.3d 343 (8th Cir. 2002), the court set forth the following with respect to the defendant's argument that he was unreasonably seized and searched in violation of the Fourth Amendment when officers approached him at an airport and asked for permission to search his person:

---

[11] Defendant cites Katz v. United States, 389 U.S. 347 (1967), for the proposition that "warrantless searches conducted outside the judicial process, without prior approval by a judge are per se unreasonable under the Fourth Amendment, subject only to a few specifically established and well delineated exceptions." (Motion to Suppress (doc #31) at 2) The Court notes that Katz sets forth consent as one of the exceptions that meets Fourth Amendment requirements. See Katz, 389 U.S. at 358 n.22.

> … The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." "No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." Terry v. Ohio, 392 U.S. 1, 9 (1968)(quoting Union Pac. R. Co. v. Botsford, 141 U.S. 250, 251 (1891)). Although there are significant restrictions upon police officers when conducting even minimally-intrusive searches and seizures, United States v. Poitier, 818 F.2d 679, 682 (8th Cir. 1987), consensual encounters between police officers and private citizens do not invoke Fourth Amendment protections, Florida v. Bostick, 501 U.S. 429, 434-35 (1991).
>
> The question in this case, then, is whether the officers' interactions with Rayos rose to the level of even a minimally-intrusive seizure. According to the government's account of the facts, the questioning would not have risen to a minimally intrusive, Terry-type stop, see Terry, 392 U.S. 1 (1968), because Rayos cooperated with police requests throughout their conversation at the airport. Following the appellant's recitation of the facts, the interactions may have risen to the level of a minimally intrusive seizure, because the officers' actions may have amounted to a stop and frisk when they demanded the search take place immediately, and began the search without Rayos's consent.
>
> Factual findings are reviewed by this court for clear error. United States v. Spotts, 275 F.3d 714 (8th Cir. 2002). If Rayos's conversation with the officers was consensual, then there was no Fourth Amendment violation. The district court resolved the factual dispute in the government's favor. There is nothing in the record to indicate that the district court erred in finding the officers' testimony more credible than Rayos's, and we do not think the district court's factual findings were clearly erroneous.

Rayos-Parra, 312 F.3d at 345-46.

Similarly, in United States v. Mendoza-Cepeda, 250 F.3d 626 (8th Cir. 2001), the court set forth the following with respect to the defendant's argument that he was subjected to an investigatory stop when officers approached him at an airport and asked for permission to search his person:

> Mendoza-Cepeda asserts that the encounter at the airport with the officers of the Commercial Interdiction Unit was an investigatory stop which, under the Fourth Amendment, required reasonable suspicion. We disagree. Although a person may not be seized without a reasonable suspicion of criminal activity, "the

7

> [Fourth] Amendment is not triggered by a consensual encounter between an officer and a private citizen. United States v. Perez-Sosa, 164 F.3d 1082, 1084 (8th Cir. 1998), cert. denied, 525 U.S. 1186 (1999). A consensual encounter, however, may become a seizure if there is a "threatening presence of several officers, [a] display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." United States v. Hathcock, 103 F.3d 715, 718-19 (8th Cir.)(quoting United States v. White, 81 F.3d 775, 779 (8th Cir. 1996)), cert. denied, 521 U.S. 1127 (1997). Here, only two officers of the Commercial Interdiction Unit were present, no weapon was displayed, Mendoza-Cepeda was not physically touched until after he consented to the touching of his torso, and the language used by Sergeant Burns does not indicate that Mendoza-Cepeda's compliance was compelled. The encounter was in a public place, and Mendoza-Cepeda was not in custody at the time. The encounter between Sergeant Burns and Mendoza-Cepeda at the taxi stand did not constitute a seizure.

Mendoza-Cepeda, 250 F.3d at 628.

In order to determine whether a particular encounter is consensual or constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officer's requests or otherwise terminate the encounter. See Florida v. Bostick, 501 U.S. 429, 439 (1991); United States v. Robinson, 984 F.2d 911, 913 (8th Cir. 1993). As long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual. Only when an officer, by means of physical force or show of authority, has in some way restrained the liberty of an individual should a court conclude that a seizure has occurred. See Bostick, 501 U.S. at 434; Robinson, 984 F.2d at 913-14.

The government bears the burden of proving that an individual's consent was voluntarily given. See United States v. Willie, 462 F.3d 892, 896 (8th Cir. 2006), cert. denied, 549 U.S. 1292 (2007); United States v. Becker, 333 F.3d 858, 861 (8th Cir. 2003). The test in reviewing a consent search is whether, in the totality of the circumstances, the consent was given voluntarily and without coercion. See Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973). In United

States v. Willie, the court set forth the following guidance in judging the voluntariness of a consent to search:

> Our case law offers a catalogue of factors to consider in judging the voluntariness of a defendant's consent to search. Some relate to the characteristics and behavior of the defendant, such as the defendant's age, intelligence and education, knowledge of his constitutional rights (whether from *Miranda* warnings in the encounter at issue or from previous interactions with police), whether he was under the influence of drugs or alcohol, and whether he objected to the search or stood by silently as it was occurring. ... Others relate to the environment surrounding the defendant at the time he gave his consent, such as whether he was in custody or under arrest and whether he was in a public or secluded place. ... Still others relate to the interaction between police and the defendant in the encounter, such as whether police officers detained and questioned the defendant for a long time before obtaining his consent, whether they threatened, physically intimidated, or punished him, and whether they made promises or misrepresentations upon which the defendant relied in giving his consent. ... No one factor is dispositive; they are merely tools for analyzing the "totality of all the circumstances." ...

462 F.3d at 896 (citations omitted).

Before the Court can analyze whether the encounter between Officer Wilson and defendant Brayfield was a consensual encounter and whether consent to search was voluntarily given, the Court must resolve the conflict between the testimony of defendant Brayfield and Officer Wilson. According to Officer Wilson, he requested and received consent from defendant Brayfield to first pat him down and then further search his pockets. (See Fact No. 8, supra) Defendant Brayfield denied that Officer Wilson asked if he could pat him down and further denied that he granted consent for Officer Wilson to search his pockets. (See n.5 and n.7, supra) The Court finds the testimony of Officer Wilson to be more credible than that of defendant Brayfield. It appeared to the Court throughout Brayfield's testimony that he was not being truthful. For instance, defendant Brayfield originally testified that Larry Shelton was handcuffed, but then had to recant that testimony after it was pointed out to him that he had already testified that he could not see what was going on between Officer Wilson and Shelton. (See n.3, supra) Further, the Court did

9

not find defendant Brayfield credible when he testified that he thought the substance found in his pocket was incense (see n.8, supra) or that defendant Brayfield brought Larry Shelton to the house at midnight so that Shelton could borrow a scooter to drive back over the next day (see n.13, supra) given the facts that Brayfield had crystal meth on his person and Shelton had a smoking pipe on his person (see Fact Nos. 6 and 9, supra).

As to whether the encounter between Officer Wilson and defendant Brayfield was a consensual encounter, the Court notes that Officer Wilson did not activate the emergency sirens or lights on the patrol vehicle; he merely pulled up behind the truck Brayfield was driving when it entered the driveway.[12] (See Fact No. 2, supra) Officer Wilson identified himself, walked up to defendant Brayfield and Larry Shelton and asked how they were doing. (Id.) While the Court is sympathetic to the fact that a film crew with bright lights and cameras would cause some confusion to defendant Brayfield, there is no evidence that the presence of the film crew caused Brayfield to feel that he was not free to go about his business. The Court does not credit defendant Brayfield's testimony that Officer Wilson handcuffed him and told him to stay where he was. (See n.2 and n.3, supra) Rather, the Court believes that Officer Wilson did not handcuff Brayfield and that Wilson did not tell Brayfield anything about where Brayfield should be while Wilson patted down Larry Shelton. (See n.2 and n.3, supra) Officer Wilson testified that Brayfield reacted in a casual, friendly manner to him and that he believed his encounter with Brayfield was consensual. (See Fact Nos. 5 and 12, supra) There is no credible evidence to suggest that Officer Wilson, by means of physical force or show of authority, in some way restrained the liberty of defendant

---

[12]While defendant Brayfield argues that he was seized in that Officer Wilson pulled in behind him, thus blocking the driveway and preventing him from being able to drive away, the Court notes that Brayfield pulled into the driveway and exited his truck as if to enter the residence. There is no evidence to suggest that Officer Wilson was preventing Brayfield from leaving the residence or that he was preventing Brayfield from entering the residence.

Brayfield. The Court, therefore, finds that the encounter between Officer Wilson and defendant Brayfield was consensual.

Given the Court's finding that Officer Wilson's testimony should be credited over that of defendant Brayfield, the Court finds that Officer Wilson requested consent from Brayfield to first pat him down and then further search his pockets. As to the voluntariness of defendant Brayfield's consent, the Court notes that Brayfield never withdrew his consent to the pat-down, he never asked Officer Wilson to stop, he did not make any statements that would indicate it was no longer a consensual encounter nor did he make any attempt to physically leave. (See Fact No. 8, supra) Only five to seven minutes elapsed between Officer Wilson exiting his police vehicle and asking Brayfield for consent to search his pockets. (Id.) Officer Wilson did not threaten or physically intimidate Brayfield. (See Fact No. 11, supra) Brayfield was not restrained. (Id.) Officer Wilson did not make any promises or misrepresentations to Brayfield when asking for consent for the pat-down or to search his pockets. (Id.) Brayfield was in his early 50s. (Id.) Defendant Brayfield was not under the influence of alcohol or drugs. (Id.) Brayfield was familiar with the judicial system in that he had prior contact with law enforcement as well as a criminal history. (Id.) Officer Wilson read Brayfield the Miranda warning before he questioned Brayfield about the substance he had found in Brayfield's pocket. (See Fact No. 9, supra) Officer Wilson testified that he believed that the consents given by Brayfield were voluntary. (See Fact No. 12, supra) "The Fourth Amendment 'requires only that the police reasonably believe the search to be consensual.'" United States v. Mendoza-Cepeda, 250 F.3d 626, 629 (8th Cir. 2001)(quoting United States v. Sanchez, 156 F.3d 875, 878 (8th Cir. 1998)). The Court finds that defendant Brayfield voluntarily gave Officer Wilson consent to pat him down and then further search his pockets. There was no constitutional violation.

Finally, defendant has provided the Court with no legal authority to support his argument that suppression is warranted based on the failure of law enforcement to secure a copy of the videotape before it was erased by the production company. In United States v. Dillard, 2010 WL 5764682, *10 (D. Nev. Dec. 16, 2010), adopted by 2011 WL 463034 (D. Nev. Feb. 3, 2011), the court was presented with a similar argument, that the police failed to take steps to preserve all the COPS video that was recorded during the incident. The Dillard court found that because the defendant failed to present any evidence that the government or the police willfully failed to preserve the evidence, suppression was not warranted. Id. at *11. Defendant Brayfield has, likewise, presented no evidence that the government or the police willfully failed to preserve the evidence. Thus, suppression is not warranted.

IV. CONCLUSION

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying defendant Brayfield's Motion to Suppress (doc #31).

Counsel are reminded they have fourteen days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections to same. A failure to file and serve timely objections shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

                                                   */s/ John T. Maughmer*  
                                                     JOHN T. MAUGHMER  
                                      UNITED STATES MAGISTRATE JUDGE